## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF KENTUCKY
## PIKEVILLE DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Coking Coal, LLC, | ) | Case No.  24-70529 |
| | ) | |
| Debtor. | ) | |

## <u>NOTICE OF FILING</u>

Comes Coking Coal, LLC (the "<u>Debtor</u>"), by and through counsel, and hereby gives notice of the filing of its proposed *Final Order (i) Authorizing the Debtor to Obtain Post-Petition Secured Financing; (ii) Authorizing the Debtor's Use of Cash Collateral; (iii) Granting Adequate Protection to the Prepetition Secured Parties; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* [ECF No. 312] (the "<u>Final DIP Order</u>").

**PLEASE TAKE FURTHER NOTICE** that the Debtor hereby files a redline (the "<u>Redline</u>") of the Final DIP Order marked against the *Interim Order (i) Authorizing the Debtor to Obtain Post-Petition Secured Financing; (ii) Authorizing the Debtor's Use of Cash Collateral; (iii) Granting Adequate Protection to the Prepetition Secured Parties; (iv) Scheduling a Final Hearing; and (v) Granting Related Relief* [ECF No. 112] that was entered on December 20, 2024. The Redline is attached hereto as **Exhibit 1**.

Dated:  February 11, 2025

Respectfully submitted,

**DINSMORE & SHOHL LLP**

*/s/  Ellen Arvin Kennedy*
Ellen Arvin Kennedy, Esq. (KBA #88347)
Brandon E. Lira, Esq. (KBA #100654)
Dinsmore & Shohl LLP
100 West Main Street, Suite 900
Lexington, KY 40504
Tel.:     (859) 425-1000
Fax:     (859) 425-1099
E-mail:  ellen.kennedy@dinsmore.com
             brandon.lira@dinsmore.com

-and-

Matthew J. Stockl, Esq. (admitted *pro hac vice*)
Dinsmore & Shohl LLP
550 S. Hope Street, Suite 1765
Los Angeles, CA 90071
Tel.:      (213) 335-7737
Fax:      (213) 335-7740
E-mail:   matthew.stockl@dinsmore.com

**Counsel for Debtor and Debtor-in-Possession**

## <u>CERTIFICATE OF SERVICE</u>

I certify that on February 11, 2025, a copy of the foregoing was sent via ECF to all parties

registered to receive notice was served electronically. A certificate of service for mail service will

be filed separately.


*/s/  Ellen Arvin Kennedy*
**Counsel for Debtor and Debtor-in-Possession**

## Exhibit 1

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF KENTUCKY**
**PIKEVILLE DIVISION**

| | |
|---|---|
| **In re:** | Chapter 11 |
| **Coking Coal, LLC,** | Case No. 24-70529 |
| **Debtor.** | |

~~INTERIM~~FINAL **ORDER (I) AUTHORIZING THE DEBTOR TO OBTAIN POST-PETITION SECURED FINANCING; (II) AUTHORIZING THE DEBTOR'S USE OF CASH COLLATERAL; (III) GRANTING ADEQUATE PROTECTION TO THE PREPETITION SECURED PARTIES; (IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the Motion ("Motion")[1] of the Debtor for entry of ~~an interim~~a final order (the "~~Interim~~Final DIP Order"): (i) authorizing the Debtor to obtain post-petition financing on the terms described in the Motion, including, without limitation, a non-revolving credit facility (the "DIP Non-Revolver Facility," and advances thereunder, the "Non-Revolver Facility Draws") for up to $4,500,000.00 in principal~~, and, upon entry of the Final DIP Order (as defined below), the roll up of the outstanding pre-petition obligations of the Debtor to the DIP Lender (as defined in the DIP Facility Loan Documents) in respect of the Pre-Petition Loan Documents (defined below) in the amount of not less than $41,837,445.46 (the "Roll-Up Facility," the DIP Non-Revolver Facility and the Roll-Up Facility collectively referred to as the "DIP Facility") pursuant to this Interim~~ (the "DIP Facility") pursuant to this Final DIP Order, the Post-Petition Loan and Security Agreement, and Promissory Note and related and ancillary documents as between the Debtor and Tacora Capital LP (the "DIP Lender") dated as of ~~the~~ December 16, 2024 (as the same may be amended, restated, supplemented, or otherwise modified from time to time in accordance with its terms and

---

[1] Capitalized terms not otherwise defined in this ~~Interim~~Final DIP Order shall have the meanings ascribed to them in the Motion and the DIP Facility Loan Documents.

the terms of the ~~Interim~~Final DIP Order (collectively, the "DIP Facility Loan Documents"); (ii) authorizing the Debtor to use cash collateral; (iii) granting adequate protection to the DIP Lender; ~~(iv) scheduling a final hearing with respect to the relief requested herein (the "Final Hearing"); and (v~~and (iv) granting related relief; and upon the *Declaration of Lloyd Hill in Support of First Day Motions of Debtor and Debtor-in-Possession* ("First Day Declaration"); and the Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and this Court having found that it may enter this ~~Interim~~Final DIP Order consistent with ~~Article III~~applicable Federal Rules of Bankruptcy Procedures and the ~~United States Constitution~~Bankruptcy Code; and this Court having found that venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and having heard the statements in support of the relief requested therein at a hearing before this Court ("Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief the Motion requested; and objections, if any, having been withdrawn, resolved, or overruled by the Court, **THE COURT HEREBY FINDS THAT**[2]:

A.      On December 16, 2024 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "Chapter 11 Case").   The Debtor has retained possession of its property and continues to operate its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

---

[2] This Order shall constitute findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052 and shall take effect and be fully enforceable as of the Petition Date.

B.     ~~As~~On or about December 26, 2024, the Official Committee of ~~the date hereof, no official committee of unsecured creditors~~Unsecured Creditors (the "Committee") ~~has been~~was appointed in the Chapter 11 Case.

C.     This Court has core jurisdiction over the Chapter 11 Case, the Motion, and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue for the Chapter 11 Case and proceedings on the Motion is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, and 9014 and the Local Rules.

D.     Subject to Paragraph 8(a) of this ~~Interim DIP Order~~Final DIP Order and the rights of the parties-in-interest set forth therein, the Debtor admits, stipulates, and agrees that:

a.   The Pre-Petition Loan Documents evidence and govern the Pre-Petition Obligations, the liens and security interests created and granted pursuant to the Pre-Petition Loan Documents in favor of the DIP Lender (the "Pre-Petition Liens and Security Interests"), and the prepetition financing relationship among the Debtor and the DIP Lender;

b.   The Pre-Petition Obligations constitute the legal, valid and binding obligations of the Debtor, enforceable in accordance with the terms of the Pre-Petition Loan Documents, all of which are deemed to be reaffirmed by the parties thereto;

c.   As of the Petition Date, the Debtor is liable for the payment and performance of the Pre-Petition Obligations, and the Pre-Petition Obligations shall be an allowed claim in an amount not less than $41,837,445.46.

3

d.  No offsets, reductions, defenses, claims, or counterclaims to the Pre-Petition Obligations exist, and no portion of the Pre-Petition Obligations is subject to contest, objection, recoupment, defense, counterclaim, offset, avoidance, recharacterization, subordination, or any other claim, cause of action or challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law, or otherwise.

e.  The Pre-Petition Liens and Security Interests secure payment of all the Pre-Petition Obligations.

f.  The Debtor does not have, and hereby absolutely, unconditionally, and irrevocably releases, remises, waives and discharges and is forever barred from bringing or asserting any claims, counterclaims, causes of action, defenses or setoff rights relating to the Pre-Petition Loan Documents, the Pre-Petition Liens and Security Interests, or the Pre-Petition Obligations against the DIP Lender and its successors and assigns, and its present and former shareholders, members, managers, partners, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, advisors, principals, employees, consultants, agents, legal representatives and other representatives, solely in its capacity as a DIP Lender (or Pre-Petition lender) of the Debtor and in no other capacity. (collectively, the "Released Parties").  For the avoidance of doubt, the Debtor forever waives and releases any and all "claims" (as defined in the Bankruptcy Code), counterclaims, causes of action, defenses or setoff rights against the DIP Lender (on account of both the Pre-Petition Obligations and Post-Petition Petition Obligations), whether arising at law or in equity, including

4

any recharacterization, subordination, avoidance or other claim arising under or pursuant to section 105 or chapter 5 of the Bankruptcy Code or under any other provisions of applicable state or federal law.  Released Parties shall include all entities or individuals who hold an economic or other interest in the DIP Lender including the following: Tacora Capital, LP, Tacora Capital Management, LP, Tacora Capital GP LLC.

E.      The DIP Lender is entitled to adequate protection as set forth herein pursuant to Bankruptcy Code sections 361, 362, 363, and 364 for any decrease solely to the extent of any actual diminution in the value of its interests in the Collateral granted by the Debtor to the DIP Lender to secure the payment of the Pre-Petition Obligations pursuant to the Pre-Petition Loan Documents (the "Pre-Petition Collateral") as well as the DIP Collateral from and after the Petition Date.

F.      The Debtor needs to use Cash Collateral and obtain proceeds from the DIP Non-Revolver Facility as provided herein through the conclusion of the Final Hearing, in order to prevent immediate and irreparable harm to the Debtor's bankruptcy estate and minimize disruption to and avoid the termination of its business operations. Entry of this Interim Final DIP Order will also enhance the possibility of maximizing the value of the Debtor's business in connection with a chapter 11 plan of reorganization.

G.      The Debtor is unable to obtain unsecured credit allowable under Bankruptcy Code section 503(b)(1) sufficient to finance the operation of its business.  The Debtor is unable to obtain credit allowable under Bankruptcy Code sections 364(c)(1), (c)(2), or (c)(3) on terms more favorable than those offered by the DIP Lender.  An immediate need exists for the Debtor to obtain proceeds of the DIP Non-Revolver Facility in order to continue operations, order critical equipment, and to administer and preserve the value of its bankruptcy estate.  The Debtor, as of

5

the Petition Date, does not have sufficient cash resources to finance its ongoing operations and requires the availability of working capital from the DIP Non-Revolver Facility, the absence of which would immediately and irreparably harm the Debtor, its estate, its creditors, and all other stakeholders.

H.    The terms of the DIP Non-Revolver Facility have been negotiated at arm's length, ~~and~~ the DIP Non-Revolver Facility is being extended in good faith, as that term is used in Bankruptcy Code section 364(e~~).~~) and the DIP Lender is entitled to the benefits of the provisions such section.

I.    The terms and conditions of the DIP Facility Loan Documents are fair and reasonable, the best available under the circumstances, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and consideration.

J.    Under the circumstances of this Chapter 11 Case, this ~~Interim~~Final DIP Order is a fair and reasonable response to Debtor's request for the DIP Lender's consent to the use of Cash Collateral and provision of the DIP Non-Revolver Facility, and the entry of this ~~Interim~~Final DIP Order is in the best interests of the Debtor's bankruptcy estate, its creditors, and all other parties in interest.

**WHEREFORE, IT IS HEREBY ORDERED THAT THE MOTION IS GRANTED, AND THAT:**

1.    <u>Authorization to Use Cash Collateral</u>.  The Debtor is authorized to use the DIP Lender's cash collateral ("<u>Cash Collateral</u>") solely in accordance with the terms and provisions of this ~~Interim~~Final DIP Order, to the extent required to pay when due those expenses enumerated in the Approved Budget, and to pay and/or reimburse any and all fees, costs, expenses charges due

6

under any of the DIP Facility Loan Documents, including, without limitation, the Issuance Fee (defined in the DIP Facility Loan Documents) (such fees, costs, expenses, and/or charges, collectively, the "DIP Facility Charges").

2.    Authorization to Enter Into The DIP Facility and Incur Indebtedness Thereunder.

a.    DIP Facility Loan Documents.    The Debtor is hereby immediately authorized, directed, and has agreed to:  (i) execute the DIP Facility Loan Documents, including all documents that the DIP Lender finds reasonably necessary or desirable to implement the transactions contemplated by the DIP Facility Loan Documents; and (ii) perform its obligations under and comply with all of the terms and provisions of the DIP Facility Loan Documents and this Interim DIP Order (including, subject to the entry of the Final DIP Order, conversion of all Pre-Petition Obligations into Post-Petition Obligations (as defined in the DIP Facility Loan Documents) pursuant to the Roll-Up Facility).Final DIP Order.    Upon execution and delivery thereof, the DIP Facility Loan Documents shall constitute valid and binding obligations of the Debtor enforceable in accordance with their terms.  To the extent there exists any conflict among the terms of the Motion, the DIP Facility Loan Documents, and thisthe Interim DIP Order and this Final DIP Order, this InterimFinal DIP Order shall govern and control.

b.    Authorization to Incur DIP Obligations. To enable the Debtor to continue to operate its business, during the period from the entry of this InterimFinal DIP Order through and including the earliest to occur of (i) the entry of the Final DIP Order, and (ii) the Termination Date, in each case unless extended by up to fourteen (14) calendar days by written agreement of the Debtor and the DIP Lender without further order of this Court (such earliest date, as may be extended pursuant to this Paragraph 2(b), the "InterimFinal Period Outside Date" and, the period from the entry of this InterimFinal DIP Order through and including InterimFinal Period Outside

7

Date, the "~~Interim~~Final Period"), and subject to the terms and conditions of this ~~Interim~~Final DIP Order and the DIP Facility Loan Documents, including, without limitation, the Approved Budget (as defined below), the Debtor is hereby authorized to borrow under the DIP Non-Revolver Facility Draws in an aggregate outstanding principal amount comprising Non-Revolver Facility Advances not to exceed $1~~4~~,500,000.00, and~~, following the entry of the Final DIP Order,~~ the Debtor's authority to incur further Post-Petition Obligations, if any, will be governed by the terms of such Final DIP Order.  Upon entry of a Final DIP Order: (i) the Debtor shall, subject to the terms of the DIP Facility Loan Documents and such Final DIP Order, be entitled to borrow all amounts under the DIP Non-Revolver Facility and use Cash Collateral to fund the Debtor's working capital and other general corporate needs and pay such other amounts required or allowed to be paid pursuant to the DIP Facility Loan Documents, the Approved Budget (as defined below), the Final DIP Order, and any other orders of this Court~~, and all outstanding Pre-Petition Obligations shall be automatically converted to Post-Petition Obligations~~.

> i.       Interest.  Notwithstanding anything stated herein or in any of the DIP Facility Loan Documents, all amounts advanced under the DIP Loan shall bear interest at 13.5% per annum.  The defined terms "Contract Rate" and "Default Rate" set forth in the DIP Facility Loan Agreement and the Promissory Note (as referenced and defined in the DIP Facility Loan Agreement), are and shall be deemed to be amended accordingly, to each state an interest rate of 13.5% per annum, irrespective of the existence of a Default or an Event of Default (each as defined in the DIP Facility Loan Agreement).

c.       Permitted Uses of DIP Facility Proceeds.  The Debtor is authorized and has agreed to utilize proceeds of the DIP Non-Revolver Facility solely:  (i) in accordance with the

terms and provisions of the DIP Facility Loan Documents and this ~~Interim~~Final DIP Order; (ii) to the extent required to pay those expenses enumerated in the Approved Budget as and when such expenses become due and payable, subject to variances as permitted under the DIP Facility Loan Documents and the other terms of the DIP Facility Loan Documents; and (iii) to pay the DIP Facility Charges.  If the DIP Lender advances monies to Debtor and Debtor uses such monies other than in accordance with the terms or provisions of this ~~Interim~~Final DIP Order and the DIP Facility Loan Documents, such advances shall be considered Post-Petition Obligations for purposes of this ~~Interim~~Final DIP Order.

        d.      Approved Budget.  Attached hereto as **<u>Exhibit A</u>** is a 13-week cash flow budget (the "<u>Initial Approved Budget</u>") which reflects on a line-item basis the Debtor's (i) weekly projected cash receipts, (ii) weekly projected disbursements (including ordinary course operating expenses, bankruptcy-related expenses under the Chapter 11 Case, capital expenditures, asset sales, including the fees relating thereto, and budgeted fees and expenses of the DIP Lender, and any other fees and expenses relating to the DIP Non-Revolver Facility), (iii) the sum of weekly unused Non-Revolver Facility availability under the DIP Facility plus unrestricted cash on hand (collectively, "<u>Aggregate Liquidity</u>"), and (iv) the weekly outstanding principal balance of the Post-Petition Obligations. Commencing on ~~December 20~~January 17, 2024, and continuing every Friday thereafter (i.e., every week), the Debtor shall prepare and deliver to the DIP Lender <u>and the Committee</u> an updated "rolling" 13-week cash flow budget, which, once approved in writing by the DIP Lender, in its sole discretion, shall supplement and replace the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect (each such updated budget that has been approved in writing by the DIP Lender, a "<u>Supplemental Approved Budget</u>") without further notice, motion, or Court order; <u>provided, however</u>, that unless and until the DIP Lender has

approved such updated budget, the Debtor shall remain subject to and be governed by the terms of the Initial Approved Budget or Supplemental Approved Budget, as applicable, then in effect, and the DIP Lender shall not, as applicable, have any obligation to fund to such updated "rolling budget" or permit the use of Cash Collateral with respect thereto, as applicable. Commencing on December 25January 22, 2024 and continuing every Wednesday thereafter (i.e., every week), the Debtor shall provide to the DIP Lender and the Committee: (x) a variance report/reconciliation report certified by the Chief Financial Officer (or some other appropriate officer) of the Debtor, in form acceptable to the DIP Lender, setting forth (A) the actual cash receipts, expenditures, disbursements, and outstanding DIP Non-Revolver Facility balance of the Debtor for such immediately preceding fiscal week (including any "stub week" that includes the Petition Date) cumulatively and on a line-item basis, and the Aggregate Liquidity as of the end of such week, and (B) the variance in dollar amounts of the actual expenditures, disbursements, and outstanding DIP Non-Revolver Facility balance for each week and cumulatively from those budgeted amounts for the corresponding week and cumulatively as reflected in the Approved Budget (defined below), and (y) a certificate signed by the Chief Financial Officer (or some other appropriate officer) of the Debtor, in form acceptable to the DIP Lender, certifying whether the Debtor is in full compliance with the Initial Approved Budget and any Supplemental Approved Budget, as applicable, for the applicable testing period. The Initial Approved Budget and any Supplemental Approved Budget, whichever is then in effect, shall constitute the "Approved Budget." Notwithstanding anything to the contrary in this InterimFinal DIP Order, the reasonable professional fees, costs and expenses of the DIP Lender (including, without limitation, counsel and other advisors therefor) shall be due, payable and paid in accordance with the terms of this

10

~~Interim~~Final DIP Order notwithstanding any budgeted amounts for such fees, costs and expenses set forth in the Approved Budget.

i.    Notwithstanding anything set forth herein or in any Approved Budget, the Committee's professionals shall be paid the higher of: (y) ratably with the Debtors' professionals (if there is a short fall in the Approved Budget) or, in the alternative, (z) no less than 50% of the budgeted amounts for compensation and reimbursement of the Debtor's professionals through the current budget period and all subsequent budget periods.  For the avoidance of doubt, nothing in this provision is intended to, or shall in any way, increase the total amount of the Carve Out as referenced in the Approved Budget and approved by the DIP Lender in writing.

e.    <u>Prohibited Uses of DIP Facility Funds</u>.  The Debtor shall not, through any manner or means or through any other person, directly or indirectly use proceeds of the DIP Non-Revolver Facility in connection with any investigation (including discovery proceedings), initiation, or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lender (related to either Pre-Petition Obligations or Post-Petition Obligations), ~~except for up~~subject to ~~$25~~the Committee's challenge rights which shall be funded with $75,000.00 (the "<u>Committee Investigation Budget</u>") ~~permitted~~and may be used for investigation fees and costs related to the investigation of ~~any official~~the Pre-Petition Obligations by the Committee ~~appointed in the Chapter 11 Case pursuant to section 1102 of the Bankruptcy Code~~.

f.    <u>DIP Liens</u>. As security for the Post-Petition Obligations, the following first priority security interests and liens are hereby granted to the DIP Lender, on all property of the Debtor, now existing or hereinafter acquired, including, without limitation, all cash and cash equivalents (whether maintained with the DIP Lender or otherwise), and any investment in such cash or cash equivalents, money, inventory, goods, accounts receivable, contract rights, other

11

rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, mining permits, any other permits, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, securities (whether or not marketable), franchise rights, documents of title, letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds (provided, however, that to the extent that any lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event the DIP Lender shall be granted only a lien on the proceeds of sale or other disposition of such leasehold interests), real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock of subsidiaries, tax and other refunds, insurance proceeds, commercial tort claims, ~~(subject to entry of the Final DIP Order)~~ rights under section 506(c) of the Bankruptcy Code, all other Collateral (as defined in the DIP Facility Loan Documents), and all other "property of the estate" (as defined in section 541 of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible, or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements, and cash and non-cash proceeds of all of the foregoing, excluding ~~claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law ("Avoidance Actions"), but, subject to entry of the Final DIP Order, including any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise~~<u>all Avoidance Actions (defined below) and proceeds thereon</u> (all of the foregoing collateral collectively referred to as the "<u>DIP Collateral</u>" and, all such Liens granted to

12

the DIP Lender pursuant to this ~~Interim~~Final DIP Order and the DIP Facility Loan Documents, the "<u>DIP Liens</u>"):

(i)     pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority Lien on all unencumbered DIP Collateral;

**Formatted:** Indent: Left:  0.5", First line:  0.5"

(ii)     pursuant to section 364(c)(3) of the Bankruptcy Code, a junior Lien on all DIP Collateral that is subject solely to the Pre-Petition Prior Liens (as defined below); and

(iii)     pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, senior priming lien on all DIP Collateral (including, without limitation, Cash Collateral) that is senior to any Other Secured Parties' Adequate Protection Replacement Liens (as defined below) and Pre-Petition Prior Liens (as defined below) afforded any secured creditors other than the DIP Lender (collectively, the "<u>Primed Liens</u>") regarding the Post-Petition Obligations related to the DIP Non-Revolver Facility; provided, however, that the liens described in this clause (iii) shall be junior solely to the Carve-Out<u> and KU's liens on the KU Collateral (as defined below).</u>

(iv)     ~~DIP Lien Priority. Notwithstanding anything to the contrary contained in this Interim~~<u>For the avoidance of doubt, the DIP Collateral shall exclude claims, causes of action or rights under sections 502(d), 544, 545, 547, 548, 549, 550, and 553 of the Bankruptcy Code and any other avoidance or similar action under the Bankruptcy Code or similar state law ("Avoidance Actions"), including any proceeds or property recovered, unencumbered or otherwise, from Avoidance Actions, whether by judgment, settlement or otherwise.</u>

(v)     <u>Kentucky Utilities Company.  Notwithstanding any to the contrary in this Final DIP Order or in any documents memorializing the terms of the DIP Facility Loan</u>

Documents, the DIP Liens shall not prime, and shall be junior to, any valid and enforceable liens or security interests that Kentucky Utilities Company, including its Old Dominion Power Company unit (collectively, "KU"), may have on security deposits, bonds or other security made or provided by the Debtor to KU, whether prepetition or post-petition, to secure the Debtor's payment of any and all obligations owing to KU by the Debtor on its utility accounts with KU (the "KU Collateral").

(vi) Marco International Corporation. Marco International Corporation ("Marco") asserts an ownership interest in certain coal (which amount is in dispute as between Marco and the Debtor) currently held by the Debtor on its premises (the "Marco Coal"), pursuant to those certain (a) Sale and Repurchase Agreement dated May 10, 2024; (b) Sale and Repurchase Agreement Dated August 14, 2024; (c) Master Bailment Agreement dated May 10, 2024 (as amended); and (d) ancillary agreements and dealings (collectively, the "Marco Agreements"). For the avoidance of doubt, nothing in the Interim Order, this Final Order or the DIP Facility Documents shall modify, amend or supersede or otherwise diminish or effect the terms and agreements under the Marco Agreements or the ownership interest in the Marco Coal. To the extent that the Marco Agreements are deemed effective and enforceable, and all or a portion of the Marco Coal is deemed to be Marco's property (and not property of the estate under the Bankruptcy Code), the Marco Coal (or the portion deemed to be Marco's property) shall not be considered DIP Collateral under the DIP Facility Loan Documents and shall be excluded from any liens and claims granted under this Final DIP Order. In the event this Court enters a final order declaring and finding that all or a portion of the Marco Coal is property of the estate under the Bankruptcy Code, then Marco asserts an alleged perfected security interest or lien in the

14

Marco Coal (or the portion that is deemed to be property of the estate), Marco reserves all rights as a secured creditor and Marco objects to the priming of such asserted perfected security interest or lien in the Marco Coal by the DIP/Adequate Protection Package (defined below).  The foregoing is without prejudice to the DIP Lender, the Debtor and/or the Committee to investigate, and challenge: (a) the extent, validity, enforceability, priority or avoidability of Marco's alleged interests, rights and claims in the Marco Coal alleged pursuant to the Marco Agreements (including, without limitation, Marco's alleged ownership rights or rights as an alleged secured creditor), and/or (b) Marco's right, entitlement or need for adequate protection to the extent that this Court determines that Marco holds a valid and perfected secured claim.  All rights to conduct such an investigation regarding either (a) or (b) above, and assert such a challenge, by any interested party identified above are reserved and preserved.  Marco's rights to defend any such investigation or challenge are likewise fully reserved and preserved.  In the event this Court enters a final order declaring and finding that either (a) the Marco Agreements are ineffective, or (b) that Marco does not have ownership rights to, or a valid and perfected security interest or lien in, all or a portion of the Marco Coal, then the DIP Liens, DIP Lender's Adequate Protection Replacement Liens, DIP Superiority Claims and Other Secured Parties' Adequate Protection Superiority Claim (collectively, the "DIP/Adequate Protection Package") shall attach to the Marco Coal (or the portion as designated by the Court), as provided in this Final DIP Order and the DIP Facility Loan Documents; provided that in the event this Court determines that Marco has a valid and perfected security interest or lien in, all or a portion of the Marco Coal, then the priority of the DIP/Adequate Protection Package with respect to the Marco Coal, priming of Marco's asserted alleged

15

perfected security interest or lien in the Marco Coal and Marco's right, entitlement or need for adequate protection shall be decided in conjunction with such determination. Until such time as the Court enters a final order with respect to the matters identified in this provision or until the Debtor, the DIP Lender, the Committee and Marco otherwise agree in writing, the Marco Coal shall remain on the Debtor's premises and not be sold to any third-party.

(vii)    Panorama Equipment Leasing I LLC. Panorama Equipment Leasing I LLC ("Panorama") asserts certain interests in certain equipment (the "Panorama Equipment") leased by the Debtor pursuant to the Equipment Sale and Leaseback Agreement, entered into as of December 26, 2022, by and between Panorama, as Lessor, and the Debtor, as Lessee (the "Panorama Lease"). To the extent that the Panorama Lease is a true lease, no liens or claims, whether in favor of the DIP Lender or offered as adequate protection, shall attach to the equipment which is the subject of the Panorama Lease. For the avoidance of doubt, nothing in this Final DIP Order shall impair the rights or otherwise prime the interests of Panorama. Nothing contained in this Final DIP Order shall create an inference, acknowledgement or agreement that the DIP Lender, the Debtor, and /or Committee have agreed to or acknowledged the extent of Panorama's interest in the Panorama Equipment, and nothing in this Final DIP Order shall prohibit or adversely affect the rights of either the Debtor, the DIP Lender or the Committee (to the extent applicable) from investigating, objecting to, or contesting, the validity, extent, amount, perfection, priority, or enforceability of any interest claimed in or against the Panorama Equipment by Panorama. Furthermore, nothing in this Final DIP Order shall limit Panorama's rights or defenses in

16

connection with any such investigation, objection or challenge, all of which are likewise fully reserved and preserved.

(viii)   Continental Heritage Insurance Company ("Continental") Collateral Funds. Pursuant to a General Indemnity Agreement, Collateral Buildup Agreement and Collateral Agreement, each entered into between the Debtor and Continental on or about December 17, 2020 (the "Continental GIA and Collateral Agreements"), Continental holds or will hold certain "Collateral Funds" in a "Collateral Account," as each term is defined in the Continental GIA and Collateral Agreements, including, without limitation: (i) $520,000.00 in cash; and (ii) proceeds in the approximate amount of $2,000,000.00 from a draw on Irrevocable Standby Letter of Credit No. 1229 and Irrevocable Standby Letter of Credit No. 1230, each issued by Central Bank & Trust. Co. (collectively the "Continental Collateral Funds"). Notwithstanding anything to the contrary in this Final DIP Order or in the DIP Facility Loan Documents, the Continental Collateral Funds do not and shall not (a) constitute DIP Collateral; (b) be subject to any DIP Liens; and/or (c) be subject to any Other Secured Parties' Adequate Protection Replacement Liens, provided however, that any and all residual interests held by the Debtor in the Continental Collateral Funds resulting from (x) the Debtor replacing, releasing and/or returning all Bonds issued by Continental and/or (y) the Debtor achieving "Obligation Completion" (as defined in the Collateral Buildup Agreement) with respect to all Bonds issued by Continental shall constitute DIP Collateral and subject to a first priority perfected lien pursuant to Section 364(c)(3) of the Bankruptcy Code in favor of DIP Lender, junior to and subject only to all rights and remedies of Continental under the Continental GIA and Collateral Agreements. Nothing herein shall constitute agreement on the part of the DIP Lender, the Debtor and/or

17

Committee with Continental's position that the Continental Collateral Funds do not constitute property of the estate. To the extent that the Bankruptcy Court determines that the Continental Collateral Funds are property of the estate and constitute "cash collateral" as defined in 11 U.S.C. 363, nothing in this Order is intended to authorize the Debtor to use, sell, lease or otherwise encumber and/or dispose of the Continental Collateral Funds without Continental's written consent or appropriate order of this Bankruptcy Court.

(ix)     Central Bank.  On January 22, 2021, Central Bank issued two letters of credit, ISLOC Nos. 1229 and 1230 (collectively, the "Continental Heritage Letters of Credit"), for the benefit of Continental each in the amount of $1 million.  On February 24, 2022, Central Bank issued a letter of credit, ILOC No. 1294 (the "Cumberland Valley Letter of Credit", together with the Continental Letters of Credit, the "Central Bank Letters of Credit"), for the benefit of Cumberland Valley Electric in the amount of $75,000.  The Central Bank Letters of Credit are secured by security interests in three certificates of deposit at Central Bank in the name of the Debtor (collectively, the "Central Bank CDs"). Notwithstanding anything to the contrary herein or in the DIP Facility Loan Documents, the Central Bank Letters of Credit and the Central Bank CDs do not and shall not (a) constitute DIP Collateral; (b) be subject to any DIP Liens; and/or (c) be subject to any Other Secured Parties' Adequate Protection Replacement Liens; provided however, that any and all residual interests held by the Debtor in the Central Bank CDs hereby are deemed to be DIP Collateral and subject to a first priority perfected lien pursuant to Section 364(c)(3) of the Bankruptcy Code in favor of DIP Lender.  Further, to the extent the Central Bank CDs constitute "cash collateral" as defined in 11 U.S.C. 363, nothing in this Final DIP Order is intended to authorize the Debtor to use, sell, lease or otherwise encumber

18

and/or dispose of the Central Bank CDs without Central Bank's written consent or further order by this Bankruptcy Court.  Nothing contained in this Final DIP Order shall create an inference, acknowledgement or agreement that the DIP Lender, the Debtor, and /or Committee have agreed to or acknowledged the extent of Central Bank's interest in the Central Bank CDs, and nothing in this Final DIP Order shall prohibit or adversely affect the rights of either the Debtor, the DIP Lender or the Committee (to the extent applicable) from investigating, objecting to, or contesting, the validity, extent, amount, perfection, priority, or enforceability of any interest claimed in or against the Central Bank CDs by Central Bank.

(x)    Natural Resource Partners L.P. ("NRP") and ACIN LLC ("ACIN").  ACIN LLC and the Debtor are parties to that certain Coal Mining Lease entered into May 11, 2020, effective as of September 17, 2019 ("ACIN Lease 8218"), that certain Bill of Sale, Assignment and Agreement entered into May 11, 2020, effective as of September 17, 2019 (the "ACIN Bill of Sale"), that certain Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Production, entered into May 11, 2020, effective September 17, 2019 (the "ACIN Original Deed of Trust"), that certain First Amendment to Deed of Trust, Security Agreement, Financing Statement, Fixture Filing and Assignment of Production, entered into and effective as of January 26, 2024 (the "ACIN Amended Deed of Trust"), and that certain Third Amendment to Coal Mining Lease dated January 26, 2024 (the "ACIN Lease Amendment", together with the ACIN Lease 8218, the ACIN Bill of Sale, the Original Deed of Trust, and the Amended Deed of Trust collectively referred to as the "ACIN Documents").   For the avoidance of doubt, to the extent there is a conflict regarding the scope of the ACIN Senior Collateral and/or the

19

ACIN Junior Collateral as between the terms of the Final DIP Order and the ACIN Consent Agreement (together with the terms of the ACIN Amended Deed of Trust and the ACIN Lease Amendment to the extent made applicable by the ACIN Consent Agreement), the ACIN Consent Agreement (together with the terms of the ACIN Amended Deed of Trust and the ACIN Lease Amendment to the extent made applicable by the ACIN Consent Agreement) shall control.

a.      In connection with the ACIN's Amended Deed of Trust and the ACIN Lease Amendment, ACIN, the Debtor and the DIP Lender entered into that certain Consent and Agreement dated January 26, 2024 (the "ACIN Consent Agreement") wherein ACIN agreed to subordinate certain of its first priority liens and security interests to the DIP Lender with respect to certain collateral as set forth therein (collectively, the "ACIN Junior Collateral") and ACIN retained its a first priority liens and security interests as to certain other collateral as set forth therein, including as set forth in the Amended Deed of Trust as incorporated in the ACIN Consent Agreement (collectively, the "ACIN Senior Collateral").

b.      Pursuant to, and in accordance with, this Final DIP Order, the DIP Lender shall hold (i) second priority perfected liens and security interests on the ACIN Senior Collateral (behind ACIN's first priority liens and security interests), (ii) first priority priming perfected liens and security interests on the ACIN Junior Collateral, (iii) first priority liens and security interests on any property and/or collateral in which ACIN asserts liens and security interests but is not properly perfected, if any such property exists; and (iv) first priority liens and security interests on any property and/or collateral in which ACIN does not assert an interest, to the extent this Final DIP Order does not specifically

20

state otherwise.  Nothing contained in this Final DIP Order shall grant the DIP Lender or any other party priming liens and priming claims, whether in favor of the DIP Lender or offered as adequate protection, with respect to the ACIN Senior Collateral.

c.      To the extent there is other property or collateral not addressed in this provision, the terms of the ACIN Consent Agreement (together with the terms of the ACIN Amended Deed of Trust and the ACIN Lease Amendment to the extent made applicable by the ACIN Consent Agreement) shall control.  All rights of the DIP Lender and ACIN are reserved and preserved.

d.      Further, if ACIN or NRP receive any payments on account of amounts due pursuant to the ACIN Documents from non-debtor, third-party sources, including, without limitation, the Debtor's surety bond with American Resources Insurance Company, such funds shall not be treated as Tacora's DIP Lender's collateral for any purpose but shall reduce the amount owed to ACIN.

e.      Nothing contained in this Final DIP Order shall create an inference, acknowledgement or agreement that the DIP Lender, the Debtor, and /or Committee have agreed to or acknowledged the effectiveness or enforceability of the ACIN Documents or ACIN's liens in the ACIN Senior Collateral or the ACIN Junior Collateral, and nothing in this Final DIP Order shall prohibit or adversely affect the rights of either the Debtor, the DIP Lender or the Committee (to the extent applicable) from investigating, objecting to, or contesting, the validity, extent, amount, perfection, priority, or enforceability of any interest claimed by ACIN in or against the ACIN Senior Collateral or the ACIN Junior Collateral, or the effectiveness or enforceability of the ACIN Documents.  Furthermore, nothing in this Final DIP Order shall limit ACIN's rights or defenses in connection with

21

any such investigation, objection or challenge all of which also are fully reserved and preserved.

(xi)    John Deere Construction & Forestry Company ("John Deere"). John Deere, pursuant to certain loan and security agreements ("John Deere Loan Documents"), asserts first priority purchase money liens and security interests in certain equipment identified as (i) a 2019 John Deere 844K-III Loader with Serial Number 1DW844KCEKF695720 ("844K Loader"), (ii) a 2015 John Deere 410E Articulated Dump Truck with Serial Number 1DW410ETLEE664650 ("410E Dump"), (iii) a 2019 John Deere 724K 4WD Loader with Serial Number 1DW724KZTKF700682 ("724K Loader"), and (iv) a 2021 John Deere 850L Crawler Dozer with Serial Number 1T0850LXVMF398572 ("850L Dozer," the 844K Loader, the 410E Dump, the 724K Loader, and the 850L Dozer collectively referred to as the "John Deere Equipment").  To the extent that John Deere holds properly perfected liens and security interests in the John Deere Equipment, no priming liens or claims, whether in favor of the DIP Lender or offered as adequate protection, shall attach to the John Deere Equipment.  The DIP Lender shall hold second position perfected liens and security interests on the John Deere Equipment (behind John Deere), but only to the extent that John Deere holds properly perfected liens and security interests in the John Deere Equipment.  Nothing contained in this Final DIP Order shall create an inference, acknowledgement or agreement that the DIP Lender, the Debtor, and /or the Committee have agreed to or acknowledged the extent of John Deere's interest in the John Deere Equipment, and nothing in this Final DIP Order shall prohibit or adversely affect the rights of either the Debtor, the DIP Lender or the Committee (to the extent applicable) from investigating, objecting to, or contesting, the validity, extent, amount,

perfection, priority, or enforceability of any interest claimed in or against the John Deere Equipment by John Deere. Furthermore, nothing in this Final DIP Order shall limit John Deere's rights or defenses in connection with any such investigation, objection or challenge, all of which are likewise fully reserved and preserved.

(xii)    Penn Virginia Operating Co., LLC ("Penn Virginia"). Penn Virginia and the Debtor are parties to a Coal Lease dated November 15, 2021 (the "PV Coal Lease") and a Ground Lease Agreement dated July 25, 2023 (the "PV Ground Lease," the PV Coal Lease and the PV Ground Lease collectively referred to as the "PV Leases"). Penn Virginia claims an ownership interest in certain property as specifically referenced in the PV Leases (the "PV Property"). Notwithstanding anything to the contrary contained in this Final DIP Order, no liens or claims, whether in favor of the DIP Lender or offered as adequate protection, shall attach to the PV Property, and with respect to the PV Leases, to the extent that any PV Lease prohibits the granting of a lien thereon, or otherwise prohibits hypothecation of the leasehold interest, then in such event the DIP Lender shall be granted only a lien on the proceeds of sale or other disposition of such leasehold interests. For the avoidance of doubt, nothing in this Final DIP Order shall impair the rights or otherwise prime the interests of Penn Virginia in the PV Property or PV Leases. Nothing contained in this Final DIP Order shall create an inference, acknowledgement or agreement that the DIP Lender, the Debtor, and /or Committee have agreed to or acknowledged the extent of Penn Virginia's interest in the PV Property, and nothing in this Final DIP Order shall prohibit or adversely affect the rights of either the Debtor, the DIP Lender or the Committee (to the extent applicable) from investigating, objecting to, or contesting, the validity, extent, amount, perfection, priority, or enforceability of any interest claimed in or against the PV

23

Property or the PV Leases by Penn Virginia.  Furthermore, nothing in this Final DIP Order shall limit Penn Virginia's rights or defenses in connection with any such investigation, objection or challenge, all of which are likewise fully reserved and preserved.  All rights of the Debtor, DIP Lender, Committee and Penn Virginia under Bankruptcy Code Section 365 are expressly preserved.

(xiii)    The Liquidating INMET Liquidating Trust (the 'INMET Trust").  The DIP Lender and the INMET Trust have mutually agreed to the purchase and sale of the INMET Trust's first-priority perfected secured claim in the amount of approximately $2,900,000.00 (as detailed in the Pigeon Creek Sale Order, the INMET's Trust's Asset Purchase Agreement and related sale agreements and documents (as referred to in the INMET Trust's Objection)), which agreement was referenced on the record at the hearing regarding the final approval of the DIP Facility Loan Documents on February 5, 2025.  The details of this agreement are subject to the finalization of relevant documentation.  As a result of the aforementioned agreement, the objections raised by the INMET Trust to the entry of the Final DIP Order and the DIP Facility Loan Documents hereby are rendered moot and deemed withdrawn.

g.    DIP Lien Priority. Notwithstanding anything to the contrary contained in this Final DIP Order or the DIP Facility Loan Documents, for the avoidance of doubt, the DIP Liens granted to the DIP Lender shall in each and every case be first priority senior liens that ~~(i),~~ to the extent provided in the provisions of this ~~Interim~~Final DIP Order and the DIP Facility Loan Documents, shall be subject only to the Carve-Out, ~~and (ii) except as provided in sub-clause (i) of this subsection (g),~~ are senior to all pre-petition and post-petition liens of any other person or entity (including, without limitation, the Primed Liens and the Other Secured Parties' Adequate

24

Protection Replacement Liens).  The ) except as referenced in paragraph 2(f)(iv) through (x). Subject to Paragraph 7(a) of this Final DIP Order and the rights of the parties-in-interest set forth therein, the DIP Liens and the DIP Superpriority Claims (as defined below) (A) subject to entry of the Final Order, shall not be subject to sections 506(c), 510, 549, 550, or 551 of the Bankruptcy Code or the "equities of the case" exception of section 552 of the Bankruptcy Code, (B) shall not be subordinate to, or *pari passu* with, (x) any lien that is avoided and preserved for the benefit of the Debtor and its estates under section 551 of the Bankruptcy Code, and (C) shall be valid and enforceable against any trustee or any other estate representative appointed or elected in the Chapter 11 Case, upon the conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "<u>Successor Case</u>"), and/or upon the dismissal of any of the Chapter 11 Case to the maximum extent permitted by law.

h.    <u>Enforceable Obligations</u>. The DIP Facility Loan Documents shall constitute and evidence the valid and binding Post-Petition Obligations of the Debtor, which Post-Petition Obligations shall be enforceable against the Debtor, its estate and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and its creditors, in accordance with their terms. No obligation, payment, transfer, or grant of security under the DIP Facility Loan Documents, or this InterimFinal DIP Order shall be stayed, restrained, voidable, avoidable, or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, 547, 548, or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act, or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual, or

25

otherwise), counterclaim, cross-claim, defense, or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.  The DIP Liens granted in this ~~Interim~~Final DIP Order shall be fully effective immediately and without any further action by the Debtor or the DIP Lender and without the execution, delivery, filing, or recordation of any financing statements, security agreements, control agreements, title notations, mortgages, deeds of trust, or other documents or instruments.  The DIP Liens granted by this ~~Interim~~Final DIP Order shall not be subject to any security interest or lien which is avoided and preserved under section 551 of the Bankruptcy Code, nor shall they be subject to section 510(c) of the Bankruptcy Code, and the DIP Liens shall remain in full force and effect notwithstanding any subsequent conversion or dismissal of the Chapter 11 Case.  ~~Subject to entry of a final order authorizing the Debtor to use Cash Collateral and incur the Post-Petition Obligations entered at or in connection with the Final Hearing (the "Final DIP Order"), the~~The DIP Liens shall not be subject to any landlord's lien, banker's lien, bailee's rights, carrier's lien, right of distraint or levy, security interest, right of setoff, or any other lien, right, or interest that any bailee, warehouseman, bank, processor, shipper, carrier, or landlord may have in any or all of the DIP Collateral.  Without limiting the foregoing, (i) the Debtor shall execute and deliver to DIP Lender such financing statements, security agreements, control agreements, title notations, mortgages, deeds of trust, instruments, and other documents as the DIP Lender may request from time to time, and any such documents filed by the DIP Lender shall be deemed filed as of the date of entry of this ~~Interim~~Final DIP Order; and (ii) the DIP Lender shall be deemed to have a perfected DIP Lien on all existing deposit accounts of the Debtor and any new deposit account that the Debtor may establish on or after the date hereof without any further action by the Debtor or the DIP Lender.  A copy of this ~~Interim~~Final DIP Order (or a notice of this ~~Interim~~Final DIP Order in recordable form) may be used by the DIP Lender as

26

a financing statement, mortgage, deed of trust, or similar instrument for purposes of any public filing made by the DIP Lender for the perfection of the DIP Liens and the filing of this ~~Interim~~Final DIP Order (or a notice of this Order in recordable form) shall have the same effect as if such instrument had been filed or recorded at the time and on the date of entry of this ~~Interim~~Final DIP Order.  All state, federal, and county recording officers are authorized and directed to accept a copy of this ~~Interim~~Final DIP Order (or a notice of this ~~Interim~~Final DIP Order in recordable form) for filing for such purposes.

i.    <u>Superpriority Administrative Expense Status</u>.  In addition to the DIP Liens granted herein, effective immediately upon entry of the ~~Interim~~Final DIP Order, all of the Post-Petition Obligations shall constitute allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve Out, over all administrative expense claims, adequate protection and other diminution claims (including the Other Secured Parties' Adequate Protection Replacement Liens (as defined below) and Other Secured Parties' Adequate Protection Superpriority Claim (as defined below)), unsecured claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind or nature whatsoever, including, without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113, and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy, or attachment (the "<u>DIP Superpriority Claims</u>").  The DIP Superpriority Claims shall, for purposes of section 1129(a)(9)(A) of the Bankruptcy Code, be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code, shall be against the Debtor, and shall be payable from and have recourse to all pre-petition and post-petition property

27

of the Debtor and all proceeds thereof.  Other than as provided in the DIP Facility Loan Documents and this ~~Interim~~Final DIP Order with respect to the Carve Out, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, and 331 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Case, and no priority claims are, or will be, senior to, prior to, or on a parity with the DIP Superpriority Claims or the Post-Petition Obligations, or with any other claims of the DIP Lender arising hereunder.

~~j.        Roll-Up of Pre-Petition Obligations and Adequate Protection for Lender.~~ ~~Subject to and only upon entry of a Final DIP Order, and in accordance with the DIP Facility Loan Documents, all Pre-Petition Obligations of the DIP Lender shall immediately, automatically, and irrevocably be deemed to have been converted into Post-Petition Obligations and incurred under the DIP Facility.  Until such time as the Roll-Up Facility becomes effective or in the event that the Roll-Up Facility is not approved, and to the extent there is a diminution in value of the interests of the DIP Lender in its Pre-Petition Collateral (including Cash Collateral) from and after the Petition Date resulting from the use, sale, or lease by the Debtor of the applicable Pre-Petition Collateral (including Cash Collateral), the imposition or enforcement of the automatic stay of section 362(a) of the Bankruptcy Code or otherwise (the "Diminution in Value of the DIP Lender's Pre-Petition Collateral"), the DIP Lender, is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e), and 364 of the Bankruptcy Code, Liens upon all of the DIP Collateral (such adequate protection replacement liens, the "DIP Lender's Adequate Protection Replacement Liens"), which DIP Lender's Adequate Protection Replacement Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens and the Carve-Out.  The DIP Lender's Adequate Protection Replacement Liens and the DIP Superpriority Claims: (A) shall not~~

28

~~be subject to sections 510, 549, 550, or 551 of the Bankruptcy Code or, subject to entry of the~~

~~Final DIP Order, section 506(c) of the Bankruptcy Code or the "equities of the case" exception of~~

~~section 552 of the Bankruptcy Code, (B) shall be senior in priority and right of payment to (x) any~~

~~lien that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of~~

~~the Bankruptcy Code, and (C) shall be valid and enforceable against any trustee or any other estate~~

~~representative appointed in the Chapter 11 Case or any Successor Case, and/or upon the dismissal~~

~~of any of the Chapter 11 Case.~~

k.j.    __Prohibition Against Additional Debt__.  Debtor will not incur or seek to incur

debt secured by a lien which is equal to or superior to the DIP Liens, or which is given superpriority

administrative expense status under Bankruptcy Code section 364(c)(1), unless, in addition to the

satisfaction of all requirements of Bankruptcy Code section 364, the DIP Lender has expressly

consented in writing to such order.

3.    __Adequate Protection.__

a.    DIP Lender's Pre-Petition Obligations.  The DIP Lender is entitled to

adequate protection as set forth herein and to the extent required under Bankruptcy Code sections

361, 362, 363, or 364 solely to the extent of any actual decrease in the value of such interests in

the Pre-Petition Collateral from and after the Petition Date on account of the stay, use, sale, lease,

license, grant or other disposition of the Pre-Petition Collateral (but only to the extent that the DIP

Lender held valid, enforceable and properly perfected secured liens and security interests in the

Pre-Petition Collateral and only in the priority that such Pre-Petition Liens and Security Interests

were held by the DIP Lender).  The DIP Lender hereby is granted replacement liens on the Pre-

Petition Collateral (but only to the extent that the DIP Lender held valid, enforceable and properly

perfected Pre-Petition Liens and Security Interests and only in the priority that such Pre-Petition

Liens and Security Interests were held by the DIP Lender) (the "DIP Lender's Adequate Protection Replacement Liens") as security for the complete payment and performance of the Pre-Petition Obligations, subject to the Carve Out, and which DIP Lender's Adequate Protection Replacement Liens shall be junior to the DIP Liens. As further adequate protection from any Diminution in Value, the DIP Lender is hereby granted an allowed superpriority administrative expense claim in the Chapter 11 Case and any successor case which, subject to the Carve Out, shall be junior to the superpriority administrative expense claims of the DIP Lender on account of the Post-Petition Obligations (the "DIP Lender's Adequate Protection Superpriority Claim").

a.b.    Other Pre-Petition Secured Parties.  Each pre-petition secured party holding valid, enforceable and properly perfected security interests and liens in property of the Debtor, other than the DIP Lender (collectively, the "Other Pre-PetititionPetition Secured Parties"), are entitled to adequate protection as set forth herein and to the extent required under Bankruptcy Code sections 361, 362, 363, or 364 for anysolely to the extent of any actual decrease in the value of such interests in the Other Pre-Petition Secured Parties' collateral (collectively, the "Other Pre-PetititionPetition Secured Parties' Collateral") from and after the Petition Date on account of the stay, use, sale, lease, license, grant or other disposition of any Other Pre-Petition Secured Parties' Collateral (but only to the extent that the Other Pre-Petition Secured Parties held valid, enforceable and properly perfected secured liens and security interests in the Pre-Petition Prior Secured Parties' Collateral prior to the Petition Date ("Pre-Petition Prior Liens") and only in the priority that such Pre-Petition Prior Liens were held by such Other Pre-Petition Secured Parties).  The Other Pre-Petition Secured Parties are hereby granted replacement liens on the Pre-Petition Secured Parties' Collateral (but only to the extent that the Other Pre-Petition Secured Parties held valid, enforceable and properly perfected Pre-Petition Prior Liens and only in the priority that such Pre-Petition Prior

Liens were held by such Other Pre-Petition Secured Parties) (the "Other Secured Parties' Adequate Protection Replacement Liens") as security for the complete payment and performance of the Pre-Petition Secured Parties' pre-petition debt (the "Other Secured Parties' Pre-Petition Debt"), subject to the Carve Out, and which Other Secured Parties' Adequate Protection Replacement Liens shall be junior to the DIP Liens ~~(with respect to the Post-Petition Obligations related to the DIP Non-Revolver Facility).~~. As further adequate protection from any Diminution in Value, the Other Pre-Petition Secured Parties are hereby granted an allowed superpriority administrative expense claim in the Chapter 11 Case and any successor case which, subject to the Carve Out, shall be junior only to the superpriority administrative expense claims of the DIP Lender (~~with respect to the Post-Petition Obligations related to the DIP Non-Revolver Facility) (~~the "Other Secured Parties' Adequate Protection Superpriority Claim"). Notwithstanding the adequate protection afforded the Other Pre-Petition Secured Parties herein, nothing in this ~~Interim~~Final DIP Order shall prohibit or adversely affect the rights of either the Debtor, the DIP Lender or ~~any~~the Committee (to the extent applicable) from investigating, objecting to, or contesting, the validity, extent, amount, perfection, priority, or enforceability of any lien or security interest claimed in or against the Debtor's assets by any of the Other Pre-~~Petitition~~Petition Secured Parties.

    4.    <u>Reporting and Rights of Access and Information</u>.  The Debtor shall timely comply with all reporting requirements set forth in the DIP Facility Loan Documents and Pre-Petition Loan Documents, as applicable.  The Debtor shall comply with the rights of access and information afforded to the DIP Lender under the DIP Facility Loan Documents and the Pre-Petition Loan Documents.

    5.    <u>Termination Date; Rights and Remedies</u>.

a.      Effect of Termination Date.  Subject to Paragraph 5(b) below, upon the Termination Date, and without further notice or order of Bankruptcy Court:  (i) the Debtor's authorization to use Cash Collateral and incur Post-Petition Obligations hereunder will automatically terminate; (ii) the Post-Petition Obligations shall be immediately due and payable; and (iii) the Debtor shall be prohibited from using Cash Collateral for any purpose other than application to the Post-Petition Obligations.

b.      ~~Rights and Remedies.   Following a period of five (5) days after the occurrence of the Termination Date~~Events of Default and Rights and Remedies.  In the event of any of the following:  (a) the failure of the Debtor to perform in any material respect any of its obligations pursuant to this Final DIP Order, (b) the occurrence and continuation of any "Event of Default" as defined under the DIP Facility Loan Documents, or (c) the termination or non-renewal of the DIP Facility Loan Documents as provided for in the DIP Facility Loan Documents, or if terminated sooner by an order of this Bankruptcy Court, (each of the foregoing being referred to in this Final DIP Order, individually, as an "Event of Default" and collectively, as the "Events of Default"); then (unless such Event of Default is specifically waived in writing by the DIP Lender as provided for in the DIP Facility Loan Documents, which waiver shall not be implied from any other action, inaction or acquiescence by the DIP Lender) and upon or after the occurrence of any of the foregoing, and at all times thereafter, after following a period of five (5) days after the occurrence of and Event of Default or the Termination Date and notice in writing, served by hand, facsimile or electronic mail upon (a) the Debtor's counsel, (b) counsel to the Committee, and (c) the Office of the U.S. Trustee, and no cure having occurred (such period, the "Remedies Notice Period"), at the DIP Lender's election and without further order of the Bankruptcy Court, but subject to the terms of this Final DIP Order, including, without limitation, the Carve Out, then:  (i)

32

the DIP Lender shall have automatic and immediate relief from the automatic stay with respect to the DIP Collateral (without regard to the passage of time provided for in Bankruptcy Rule 4001(a)(3)), and shall be entitled to exercise all rights and remedies available to them under the DIP Facility Loan Documents and applicable non-bankruptcy law; and (ii) the Debtor shall promptly surrender the DIP Collateral upon written demand by the DIP Lender and otherwise cooperate and not interfere with the DIP Lender in the exercise of its rights and remedies under the DIP Facility Loan Documents and applicable non-bankruptcy law.  Notwithstanding the foregoing, during the Remedies Notice Period, the Debtor, any Committee, and the Office of the U.S. Trustee shall be entitled to seek an emergency hearing seeking an order of this Bankruptcy Court determining that an Event of Default alleged to have given rise to the Termination Date did not occur, and any other issue the Bankruptcy Court determines is appropriate to resolve, including, without limitation, whether the DIP Lender remains adequately protected; provided, however, that during the Remedies Notice Period, (x) the Debtor shall be entitled to use Cash Collateral in accordance with the terms of this ~~Interim~~Final DIP Order solely in accordance with the terms of the Approved Budget, and (y) the DIP Lender shall have no obligation to advance Post-Petition Obligations to Debtor, except solely to fund the Carve Out.

   6. ~~Carve Out~~.

    c. Collateral Rights.  Until all of the Obligations shall have been indefeasibly paid and satisfied in full in immediately available funds and without further order of the Court: (i) in the event that any party who holds a lien or security interest in any of the DIP Collateral that is junior and/or subordinate to the liens and claims of the DIP Lender in such DIP Collateral receives or is paid proceeds of the DIP Collateral prior to the indefeasible payment and satisfaction in full of all Post-Petition Obligations, such junior or subordinate lienholder shall be deemed to have

received, and shall hold, such DIP Collateral proceeds in trust for the DIP Lender and shall immediately turnover to the DIP Lender such proceeds for application to the Post-Petition Obligations in accordance with the DIP Facility Loan Documents and this Final DIP Order; (ii) upon the acceleration of the Post-Petition Obligations following an Event of Default, and subject to the DIP Lender providing any required notice required by paragraph 5 of this Final DIP Order, in connection with a liquidation of any of the DIP Collateral, the DIP Lender shall have the right, at the cost and expense of the Debtor to be added to the Post-Petition Obligations, to:  (1) enter upon, occupy and use any personal property, fixtures and equipment owned or leased by the Debtor and (2) use any and all trademarks, tradenames, copyrights, licenses, patents or any other similar assets of the Debtor, which are owned by or subject to a lien of any third party and which are used by the Debtor in its business; and (3) upon the acceleration of the Post-Petition Obligations following an Event of Default, and subject to the DIP Lender providing the notice required by paragraph 5 of this Final DIP Order, as well as five (5) business days' notice to the Debtor's lessor(s) with rights to real property, surface areas or minerals that could in any way restrict access to the DIP Lender (including, without limitation, leases regarding real property, surface rights or mineral rights, to the extent applicable) (collectively, the "Property Rights Leases") of the DIP Lender's intention to enter onto or into such lessor's leased premises to remove or otherwise dispose of any DIP Collateral located at such leased premises in accordance with the terms of this paragraph, DIP Lender shall have the right, following the expiration of such five (5) business days notice period described in this paragraph, to enter onto or into such leased premises for the purpose of removing the DIP Collateral from the leased premises or selling such DIP Collateral at the leased premises, in each case subject to the applicable terms of the Debtor's lease arrangements with such lessor to the extent enforceable or effective under the Bankruptcy Code and subject to

34

the rights of the DIP Lender provided for herein (the "Collateral Access Period").  If an objection

is filed by the applicable lessor within such five (5) business day period, then the DIP Lender shall

not enter the leased premises absent further order of this Bankruptcy Court.   Nothing herein shall

require the DIP Lender to assume any lease or cure any defaults as a condition to the rights afforded

in this paragraph.  Notwithstanding anything contained herein to the contrary or otherwise, in

relation to the Debtor's Property Rights Leases, the DIP Lender shall have the right to seek

approval from the Court to conduct sales at any leased location outside the ordinary course of

Debtor's business conducted at such location, to the extent necessary, subject to the terms and

guidelines approved by the Court and the rights of any lessor of such leased location under their

respective leases and section 365 of the Bankruptcy Code, and nothing contained herein shall be

deemed to prejudice the rights of any lessor of the Property Rights Leases to object to such relief.

6.      Carve Out.  Notwithstanding anything set forth herein to the contrary, each of the

DIP Liens, the Prepetition Liens and Security Interests, the Pre-Petition Prior Liens, DIP

Collateral, Other Security Parties' Adequate Protection Replacement Liens, the DIP Superpriority

Claims, Other Secured Parties' Adequate Protection Superiority Claims, and DIP Lender's

Adequate Protection Superiority Claims, shall be subject and subordinate to payment of the Carve

Out (as defined herein), but subject to the terms and conditions set forth in this Final DIP Order

(including, without limitation, this paragraph 6).

a.      Carve Out Terms.  For purposes of this ~~Interim~~Final DIP Order, "Carve

Out" shall mean:  (i) all fees required to be paid to the Clerk of the Court and to the U.S. Trustee

under 28 U.S.C. § 1930(a) plus interest at the statutory rate (without regard to the Carve Out

35

Trigger Notice[3]) (collectively, the "Statutory Fees"); plus the sum of (ii) to the extent allowed at any time, whether by ~~final order, interim~~Final order, procedural order, or otherwise, subject to the Approved Budget, all unpaid fees, costs, disbursements, and expenses (the "Allowed Professional Fees") incurred or earned by the Carve Out Professionals[4] at any time before or on the Carve Out Trigger Date,[5] whether allowed by the Bankruptcy Court prior to, on, or after delivery of a Carve Out Trigger Notice (the "Pre-Trigger Carve Out Cap"); and (iii) Allowed Professional Fees of the Carve Out Professionals incurred after the Carve Out Trigger Date in an aggregate amount not to exceed the Post-Carve Out Trigger Notice Amount,[6] to the extent allowed at any time, whether by ~~final order, interim~~Final order, procedural order, or otherwise (the amounts set forth in this clause (iii) being the "Post-Carve Out Trigger Notice Cap") and such amounts set forth in clauses (i) through (iii), the "Carve Out Cap"); *provided that*, (A) nothing herein shall be construed to impair any party's ability to object to Court approval of the fees, expenses, reimbursement of expenses or compensation of any Carve Out Professional, (B) the Carve Out with respect to each Carve Out Professional shall not exceed the aggregate amount provided in the applicable line item in the Approved Budget for such Carve Out Professional for the period commencing on the Petition Date and ending on the Carve Out Trigger Date, (C) the Carve Out with respect to each Carve Out Professional shall be reduced dollar-for-dollar by any payment of fees and expenses to the Carve

---

[3] "Carve Out Trigger Notice" for purposes of this ~~Interim~~Final DIP Order means a written notice delivered by email by the DIP Lender to the Debtor, counsel for the Debtor, the U.S. Trustee, and counsel for any Committee (the "Carve Out Trigger Notice Parties") stating that the Post-Carve Out Trigger Cap has been invoked, which notice may be delivered following the occurrence and during the continuation of a Default or an Event of Default under the DIP Facility Loan Documents.

[4] "Carve Out Professionals" for purposes of this ~~Interim~~Final DIP Order means: (i) Dinsmore & Shohl LLP, as counsel for the Debtor; (ii) EPIQ Systems, Inc., as claims agent; and (iii) such professionals that are authorized by the Bankruptcy Court to be retained by the Debtor and/or any Committee.

[5] "Carve Out Trigger Date" for purposes of this ~~Interim~~Final DIP Order means the date that is the earliest of (x) the date on which the DIP Lender delivers (by email or other electronic means) the Carve Out Trigger Notice to the Carve Out Trigger Notice Parties, and (y) the Termination Date as provided in the DIP Facility Loan Documents.

[6] "Post-Carve Out Trigger Notice Amount" for purposes of this ~~Interim~~Final DIP Order means an amount equal to ~~$25~~the lesser of (i) the unused Pre-Trigger Carve Out Cap amount remaining as of the Carve Out Trigger Date, or (ii) $150,000.00.

36

Out Professional, (D) the Carve Out with respect to each Carve Out Professional shall be paid out of any prepetition retainer or property of the estate (other than property subject to an unavoidable security interest in favor of the DIP Lender) before such payments are made from proceeds of the Post-Petition Obligations or the DIP Collateral, and (E) no Carve Out Professional shall be entitled to any portion of the Carve Out allocated for any other Carve Out Professional in the Approved Budget, (F) any unused portion budgeted for a Carve Out Professional during a particular period shall be added to, carried over, and constitute an approved increase in the line item in the Approved Budget for that Carve Out Professional in subsequent periods, and (G) the Carve Out shall not be construed as a limitation or cap on the compensable amount of fees and expenses for any ~~professional retained by the Debtor~~Carve Out Professional, but instead only a cap on the amount of fees and expenses that can be paid from DIP Collateral.  The DIP Lender shall not be responsible for the payment or reimbursement of any fees or disbursements of any Carve Out Professional incurred in connection with the Chapter 11 Case, other than payment or reimbursement of any fees or disbursements from proceeds of DIP Collateral to the extent of the Carve Out as set forth in this Paragraph 6.  Nothing in this ~~Interim~~Final DIP Order or otherwise shall be construed to obligate the DIP Lender, in any way, to pay compensation to, or to reimburse expenses of, any Carve Out Professional or to guarantee that the Debtor has sufficient funds to pay such compensation or reimbursement.

   b. <u>Carve Out Usage</u>.   No portion of the Carve Out and no Post-Petition Obligations or DIP Collateral may be used to pay any fees or expenses incurred by any Person, including the Debtor, any Committee, or any Carve Out Professional, in connection with claims or causes of action adverse (or which claim an interest adverse) to the DIP Lender or any of its rights or interests in the DIP Collateral, Pre-Petition Loan Documents or the DIP Facility Loan

37

Documents including, without limitation, (i) preventing, hindering, or delaying the DIP Lender's enforcement or realization upon any of the DIP Collateral (or Collateral, to the extent applicable) or the exercise of its rights and remedies under this ~~Interim~~Final DIP Order, any of the DIP Facility Loan Documents, or applicable law, in each case, once an Event of Default has occurred under the DIP Facility Loan Documents, (ii) using or seeking to use any Cash Collateral or incurring indebtedness in violation of the terms hereof, or (iii) objecting to, or contesting in any manner, or in arising any defenses to, the validity, extent, amount, perfection, priority, or enforceability of any Post-Petition Obligations, any Pre-Petition Obligations, any Pre-Petition Loan Document, any DIP Facility Loan Document, or any liens or security interests with respect thereto or any other rights or interests of the DIP Lender (on account of the Pre-Petition Obligations or the Post-Petition Obligations), or in asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code, against the DIP Lender (on account of the Pre-Petition Obligations or the Post-Petition Obligations); <u>provided</u>, <u>however</u>, that the foregoing shall not apply to costs and expenses, incurred by all of the Committee's Carve Out Professionals in connection with the investigation of a potential Challenge Action in accordance with Paragraph ~~8~~7(a) of this ~~Interim~~Final DIP Order, in an aggregate amount not to exceed the Committee Investigation Budget.

   c. <u>Carve Out Procedure</u>.  On the last business day of each two-week period prior to the Carve Out Trigger Date, the Debtor shall fund a Dinsmore & Shohl LLP client trust account designated by counsel to the Debtor for the benefit of any of the Debtor's Carve Out Professionals, as well as ~~(if applicable)~~ a client trust account designated by lead counsel to any appointed Committee for the benefit of any Committee Carve Out Professionals (each, a "<u>Carve Out Account</u>"), using proceeds of the Debtor's operations and/or Post-Petition Obligations in an

amount equal to the professional fees for Carve Out Professionals as set forth in the Approved Budget for the week then ended (with the Carve Out amount for each Carve Out Professional determined in accordance with the provisos set forth in subclauses (B) through (E) in Paragraph 6(a) of this Order).  Except as set forth in the preceding sentence, the DIP Lender shall have no obligation to fund the Carve Out Accounts or any fees or expenses of Carve Out Professionals accrued on, prior to, or after the Carve Out Trigger Date and the Carve Out Accounts shall be funded solely with the proceeds of the Debtor's operations and/or Post-Petition Obligations as described in Paragraph 6(a) of this Order.  All funds in the Carve Out Accounts shall be used to pay the Carve Out (whether such fees are allowed on an ~~interim~~Final or final basis) for Allowed Professional Fees for the respective Carve Out Professionals in an amount not to exceed the Carve Out Cap and, subject to the Carve Out Cap, all Carve Out Professionals shall have all professional fees paid from the Carve Out Accounts prior to seeking payment from any other DIP Collateral.  If the Carve Out (up to the Carve Out Cap) for Allowed Professional Fees of Carve Out Professionals is paid in full, all remaining funds in the Carve Out Accounts shall be returned to the DIP Lender.  The Debtor shall periodically, upon the request of the DIP Lender, provide the DIP Lender a written report (a "Carve Out Report"), in which the Debtor shall disclose its then current estimate of (i) the aggregate amount of unpaid professional fees, costs, and expenses accrued or incurred by the Carve Out Professionals, through the date of the Carve Out Report, and (ii) projected fees, costs, and expenses of the Carve Out Professionals for the 30 day period following the date of such Carve Out Report.  Nothing herein shall be construed as consent by the DIP Lender to the allowance of any fees or expenses of the Carve Out Professionals or shall affect the rights of the DIP Lender to object to the allowance and payment of such fees, costs, or expenses, or the right of the DIP Lender to the return of any portion of the Carve Out that is funded with respect to

39

fees and expenses for a Carve Out Professional that are approved on an ~~interim~~Final basis that are later denied on a final basis.

       d.    <u>Carry Forward/Carry Back</u>.  For the avoidance of doubt, to the extent that budgeted amounts for a Carve Out Professional for any Approved Budget period exceed the actual fees and expenses incurred by such Carve Out Professional for that period, the excess may be carried forward to later Approved Budget periods or backward to prior Approved Budget periods to be applied to any fees or expenses that exceeded the budgeted amounts for such prior or later periods.

       7.    <u>No Surcharge</u>.  The Debtor represents that the Approved Budget contains all expenses that are reasonable and necessary for the operation of the Debtor's business and the preservation of the DIP Collateral through the period for which the Approved Budget runs, and therefore includes any and all items potentially chargeable to the DIP Lender under section 506(c) of the Bankruptcy Code.  Therefore, in the exercise of its prudent business judgment, ~~and subject to entry of the Final DIP Order~~, the Debtor (or any appointed trustee) agrees that there will be no surcharge of the DIP Collateral for any purpose unless agreed to in writing by the DIP Lender, ~~and effective upon entry of the Final DIP Order,~~ the Debtor (or any appointed trustee), on behalf of the bankruptcy estate, will be deemed to have waived any and all rights, benefits, or causes of action under Bankruptcy Code section 506(c), the enhancement of collateral provisions of Bankruptcy Code section 552, and under any other legal or equitable doctrine (including, without limitation, unjust enrichment or the "equities of the case" exceptions under section 552(b) of the Bankruptcy Code as they may relate to, or be asserted against, the DIP Lender (on account of the Pre-Petition Obligations or the Post-Petition Obligations).  The DIP Lender has agreed to the entry of this ~~Interim~~Final DIP Order in reliance on the foregoing.

8.      Reservation of Rights; Bar of Challenges and Claims.

        a.      Notwithstanding any other provisions of this ~~Interim~~Final DIP Order, any interested party with requisite standing (other than the Debtor or its professionals) in this Chapter 11 Case (including, without limitation, any Committee) shall have until the date that is ~~forty-five (45~~thirty (30) days after date of entry by the Bankruptcy Court of this ~~Interim~~Final DIP Order (such period, the "Challenge Period") to commence an adversary proceeding against the DIP Lender on account of only the Pre-Petition Obligations for the purpose (collectively, a "Challenge Action") of:  (i) challenging any of the stipulations contained in Paragraph D of this ~~Interim~~Final DIP Order; (ii) challenging the validity, extent, priority, perfection, enforceability, and non-avoidability of only the Pre-Petition Obligations of the Debtor owed to the DIP Lender; (iii) contesting the amount of the DIP Lender's asserted claims on account of only the Pre-Petition Obligations; (iv) seeking to avoid or challenge (whether pursuant to chapter 5 of the Bankruptcy Code or otherwise) any transfer made by or on behalf of the Debtor to or for the benefit of any of the DIP Lender prior to the Petition Date; or (v) seeking damages or equitable relief against ~~any of~~ the DIP ~~Lenders~~Lender on account of only the Pre-Petition Obligations arising from or related to prepetition business and lending relationships of the DIP Lender with the Debtor, including, without limitation, equitable subordination, recharacterization, lender liability, and deepening insolvency claims and causes of action.

        b.      All parties in interest, including without limitation the Committee (if any), that fail to act in accordance with the time periods set forth in the preceding paragraph shall be, and hereby are, barred forever from commencing a Challenge Action and shall be bound by the waivers, stipulations, and terms set forth in this Order.  Any Challenge Action filed shall prohibit application of this paragraph only to the extent of the specific matters set forth in such Challenge

41

Action on the date of filing unless the Court orders otherwise. For the avoidance of doubt, if any Challenge Action is timely filed and a non-appealable order is entered in favor of the plaintiff sustaining any such Challenge Action, the stipulations described in Paragraph D of this Order shall nonetheless remain binding and preclusive on any Committee and any other person or entity, except to the extent that such stipulations and admissions were raised (subject to Bankruptcy Rule 7015) in an adversary proceeding or contested matter prior to the expiration of the Challenge Period and sustained by the final, non-appealable order. Nothing in this ~~Interim~~Final DIP Order vests or confers on any Person (as defined in the Bankruptcy Code), including any Committee or any non-statutory ~~committees~~committee appointed or formed in the Chapter 11 Case, standing or authority to pursue any claim or cause of action belonging to the Debtor or its bankruptcy estate, and all rights to object to such standing are expressly reserved.

c.      The respective legal and equitable claims, counterclaims, defenses, and/or rights of setoff of the DIP Lender in response to any such Challenge Action are reserved, and the ability of a party to commence a Challenge Action shall in no event revive, renew, or reinstate any applicable statute of limitations which may have expired prior to the date of commencement of such a Challenge Action. Despite the commencement of a Challenge Action, the DIP Lender's Pre-Petition Obligations shall be deemed valid, binding, properly perfected, enforceable, non-avoidable, not subject to disallowance under Bankruptcy Code section 502(d), and not subject to subordination under Bankruptcy Code section 510 until such time as, and only to the extent that, a final and non-appealable judgment and order is entered sustaining such Challenge Action in favor of the plaintiffs therein. For the avoidance of doubt, notwithstanding anything to the contrary in this ~~Interim~~Final DIP Order or the DIP Facility Loan Documents, the replacement liens and superpriority administrative expense claims granted to the DIP Lender pursuant to this

42

~~Interim~~Final DIP Order shall be valid, enforceable, properly perfected, and unavoidable until such time as, and only to the extent that, a final and non-appealable judgment and order is entered sustaining a Challenge Action in favor of the plaintiffs therein.  Further, for the avoidance of doubt, all Post-Petition Obligations shall remain valid, enforceable, properly perfected and unavoidable, notwithstanding any pending or successful Challenge Action related to the Pre-Petition Obligations.

d.      If a Challenge Action has not been filed during the Challenge Period or a timely-asserted Challenge Action is not successful, then without further order of Court, the claims, liens, and security interests of the DIP Lender on account of the Pre-Petition Obligations shall and shall be deemed to be allowed for all purposes in this Chapter 11 Case and shall not be subject to challenge by any party in interest, including, without limitation, as to extent, validity, amount, perfection, enforceability, priority, or otherwise.

e.      The Committee is hereby granted derivative standing on behalf of the Debtor to prepare, commence, prosecute, settle or otherwise dispose of a Challenge Action and the Debtor and DIP Lender waive any and all challenges to such derivative standing.  The Debtor's formation and governance documents, i.e., certificate of organization, limited liability company agreement and any other governing documents or agreements (the "Debtor Governance Documents"), are hereby amended to permit a Challenge Action or any adversary proceeding or contested matter against the DIP Lender or otherwise concerning any of the Prepetition Liens and Security Interests, the Pre-Petition Prior Lien, the Pre-Petition Loan Documents, or the Pre-Petition Obligations against the DIP Lender, to be commenced by the Committee.  Further, Ascentia, Inc. ("Ascentia"), as the sole member of the Debtor, and Ascentia Holdings Limited, as the sole

43

member of Ascentia, each agree that the Debtor Governance Documents are amended as set forth herein.

9.      Case Milestones.  Debtor has agreed to, and is authorized to, timely satisfy each of the Milestones set forth and defined in Section 5.8 of the DIP Facility Loan Documents.  The Debtor and the DIP Lender, in consultation with the Committee, may agree to amend or otherwise modify such Milestones from time to time, in writing, without the need of any further notice, hearing, or order of this Bankruptcy Court (other than a notice of such amendment or modification to be filed with this Bankruptcy Court).

10.     Right to Credit Bid.  In connection with the sale or other disposition of all or any portion of the DIP Collateral or Pre-Petition Lender Collateral (to the extent applicable), pursuant to section 363(k) of the Bankruptcy Code, the DIP Lender shall have the right to use the Pre-Petition Obligations, the Post-Petition Obligations or any part thereof to credit bid with respect to any sale of all or any portion of the DIP Collateral or Pre-Petition Lender Collateral (to the extent applicable).

11.     Waiver of Right to Return/Consent to Setoff.  Without the prior written consent of the DIP Lender, the Debtor shall not agree or consent to any of the following:  (i) the return of any DIP Collateral pursuant to section 546(h); (ii) any order permitting or allowing any claims pursuant to section 503(b)(9) of the Bankruptcy Code; or (iii) any setoff pursuant to section 553 of the Bankruptcy Code.

12.     Indemnification.  The Debtor shall indemnify and hold harmless the DIP Lender as set forth in and in accordance with the DIP Facility Loan Documents and the Pre-Petition Loan Documents (to the extent applicable), respectively.

44

13.     <u>No Marshaling</u>.  Subject to entry of the Final DIP Order, neither the DIP Lender nor any of the DIP Collateral shall be subject to the doctrine of marshaling.

14.     <u>DIP Facility Charges</u>.  All DIP Facility Charges must be promptly paid by the Debtor in accordance with this ~~Interim~~Final DIP Order and the DIP Facility Loan Documents <u>and shall be added to the Post-Petition Obligations as accrued</u>.  To the extent the DIP Lender seeks to be reimbursed for any professional fees and/or expenses, the DIP Lender shall deliver a summary invoice (redacted for privilege) to counsel to the Debtor, the U.S. Trustee, and counsel to the Committee, ~~if one is appointed,~~ but without need for filing any application with the Bankruptcy Court for approval or payment thereof.  Notwithstanding the foregoing, if (x) the Debtor, U.S. Trustee, or the Committee object to the reasonableness of a summary invoice submitted by the DIP Lender and (y) the parties cannot resolve such objection, in each case within fourteen (14) days following receipt of such summary invoice (the "<u>DIP Lender Fee Objection Deadline</u>"), the Debtor, the U.S. Trustee or the Committee, as the case may be, shall file with this Bankruptcy Court and serve on the DIP Lender a fee objection (a "<u>DIP Lender Fee Objection</u>"), which objection shall be limited to the issue of the reasonableness of such Lender's professional fees. The Debtor shall promptly pay any submitted invoice after the expiration of the DIP Lender Fee Objection Deadline if no Lender Fee Objection is filed with this Bankruptcy Court and served on the DIP Lender prior to the DIP Lender Fee Objection Deadline.  If the DIP Lender Fee Objection is timely filed and served, the Debtor shall promptly pay the undisputed amount of the summary invoices, and this Bankruptcy Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the DIP Lender Fee Objection.

15.     <u>Modification of Stay</u>.  The automatic stay of Bankruptcy Code section 362 is hereby modified with respect to the DIP Lender to the extent necessary to effectuate the provisions of this

Formatted: Underline

Formatted: Underline

~~Interim~~Final DIP Order, including, after the Termination Date, to permit the DIP Lender to exercise its rights contemplated by Paragraph 5 of this ~~Interim~~Final DIP Order.

16.  <u>No Waiver</u>.  The DIP Lender shall not be deemed to have suspended or waived any of its rights or remedies under this ~~Interim~~Final DIP Order, the DIP Facility Loan Documents, the Bankruptcy Code, or applicable non-bankruptcy law unless such suspension or waiver is hereafter made in writing and signed by a duly authorized officer of the DIP Lender and directed to the Debtor.  No failure of the DIP Lender to require strict performance by the Debtor (or by any trustee) of any provision of this ~~Interim~~Final DIP Order will waive, affect, or diminish any right of the DIP Lender thereafter to demand strict compliance and performance therewith, and delay on the part of the DIP Lender in the exercise of any right or remedy under this Order, the DIP Facility Loan Documents, the Bankruptcy Code, or applicable non-bankruptcy law will preclude the exercise of any right or remedy.  Further, this ~~Interim~~Final DIP Order does not constitute a waiver by the DIP Lender of any of its rights under the DIP Lender's Pre-Petition Loan Documents (to the extent applicable), the Bankruptcy Code, or applicable non-bankruptcy law.

17.  <u>Limits on Lender Liability</u>.  By taking any actions pursuant to this ~~Interim~~Final DIP Order, making any loan under the DIP Facility Loan Documents, authorizing the use of Cash Collateral, or exercising any rights or remedies available to it under the DIP Facility Loan Documents or this ~~Interim~~Final DIP Order, the DIP Lender shall not:  (i) be deemed to be in control of the operations of the Debtor (*e.g.,* a "controlling person" or "owner or operator"); (ii) be deemed to be acting as a "responsible person" with respect to the operation or management of the Debtor; (iii) otherwise cause liability to arise to the federal or state government or the status of responsible person or managing agent to exist under applicable law; or (iv) owe any fiduciary duty to the Debtor.  Furthermore, nothing in this ~~Interim~~Final DIP Order shall in any way be construed or

46

interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or post-petition activities of the Debtor.

18.    <u>Amendments</u>.  The Debtor and the DIP Lender<u>, in consultation with the Committee,</u> may enter into amendments or modifications of the DIP Facility Loan Documents or the Approved Budget without further notice and hearing or order of this Bankruptcy Court; *provided*, that (a) such modifications or amendments do not materially and adversely affect the rights of any creditor or other party in interest, and (b) notice of any such amendment or modification is filed with this Bankruptcy Court and provided to any Committee and to the U.S. Trustee.

19.    ~~<u>Participations.</u>~~<u>Participation.</u>  As and to the extent set forth in Section 8.7 of the DIP Facility Loan Documents, the DIP Lender may at any time, without the consent of, but with notice to the Debtor, sell participations or otherwise assign to any Person (each a "<u>Participant</u>") in all or a portion of such Lender's rights and/or obligations under the DIP Facility Loan Documents (including all or a portion of the DIP Loan Commitment and/or the Loan).  All obligations of the Debtor owed to Lender under <u>Section 8.3</u>, <u>Section 8.4</u>, and <u>Section 8.10</u> of the DIP Facility Loan Documents shall likewise be owed by the Debtor to any Participant.

20.    <u>Proof of Claim</u>.  The DIP Lender shall not be required to file a proof of claim with respect to any of the Pre-Petition Obligations and the stipulations and findings set forth in this ~~Interim~~<u>Final</u> DIP Order shall constitute an informal proof of claim in respect thereof.

21.    <u>Binding Effect</u>.  Except as provided in Paragraph 8 herein, this ~~Interim~~<u>Final</u> DIP Order shall be binding on all parties in interest in this Chapter 11 Case and their respective successors and assigns, including any subsequently appointed trustee.  If, in accordance with Bankruptcy Code section 364(e), this ~~Interim~~<u>Final</u> DIP Order does not become a final, non-appealable order, or if any of the provisions of the ~~Interim~~<u>Final</u> DIP Order are hereafter modified,

amended, vacated, or stayed by subsequent order of this Bankruptcy Court or any other court, such

subsequent order shall not affect the validity and enforceability of any Post-Petition Obligations,

DIP Liens, any replacement liens granted to the DIP Lender hereunder, or the section 507(b)

superpriority administrative expense claims provided by this ~~Interim~~Final DIP Order, or any other

claim, lien, security interest, or priority authorized or created hereby or pursuant to the DIP Facility

Loan Documents, or adequate protection obligations described in this ~~Interim~~Final DIP Order

incurred, prior to the actual receipt by the DIP Lender of written notice of the effective date of

such subsequent order.

22.    <u>Survival</u>.  The provisions of this ~~Interim~~Final DIP Order, and any actions taken

pursuant to or in reliance upon the terms hereof, shall survive entry of, and govern in the event of

any conflict with, any order which may be entered in this Chapter 11 Case:  (i) confirming any

chapter 11 plan; (ii) converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy

Code; (iii) dismissing the Chapter 11 Case; (iv) withdrawing the reference of the Chapter 11 Case

from this Bankruptcy Court; or (v) providing for abstention from handling or retaining of

jurisdiction of the Chapter 11 Case in this Bankruptcy Court.  The terms and provisions of this

~~Interim~~Final DIP Order, including, without limitation, the rights granted to the DIP Lender under

Bankruptcy Code section 364(c), shall continue in full force and effect until all of the Post-Petition

Obligations are paid in full.

23.    <u>Nullifying Pre-Petition Restrictions on Post-Petition Lien Grants</u>.  Notwithstanding

anything to the contrary contained in any pre-petition agreement, contract, lease, document, note

or instrument to which the Debtor is a party or under which the Debtor is obligated, any provision

that restricts, limits or impairs in any way the Debtor's ability or right to grant liens or security

interests upon any of the DIP Collateral (including, among other things, any anti-lien granting or

48

anti-assignment clauses in any leases or other contractual arrangements to which the Debtor is a party) under the DIP Facility Loan Documents or this Final DIP Order or otherwise enter into and comply with all of the terms, conditions and provisions thereof (all such provisions being collectively referred to as the "Restrictive Clauses") shall not be effective and shall be unenforceable against the Debtor and the DIP Lender to the maximum extent permitted under the Bankruptcy Code and other applicable law, but only with respect to the entry of this Final DIP Order granting such post-petition financing, and, therefore, shall not adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to the DIP Lender pursuant to this Final DIP Order, the DIP Facility Loan Documents or any of the rights of the DIP Lender hereunder or thereunder to the maximum extent permitted under the Bankruptcy Code and other applicable law.  Such Restrictive Clauses shall not, to the maximum extent permitted under the Bankruptcy Code and applicable law, render any contract or lease unable to be assumed and/or assigned by the Debtor, or in any way impair or limit the ability or right of the Debtor to assume and/or assign any contract or lease, or any lessor's right to object to such relief on any other grounds, under sections 365 or 1123 of the Bankruptcy Code.

24.     Reservation of Rights of DIP Lender.  Entry of this Final DIP Order shall not be deemed to prejudice any and all rights, remedies, claims and causes of action the DIP Lender may have against third-parties, and shall not prejudice the rights of the DIP Lender from and after the entry of this Final DIP Order to seek any other relief in the Chapter 11 Case.  Entry of this Final DIP Order shall not in any way constitute:  (a) a preclusion or a waiver of any right of the DIP Lender to file, or to prosecute if already filed, a motion for relief from stay, a motion or request for other relief, including without limitaiton, any adversary proceeding; (b) agreement, consent, or acquiescence to the terms of any plan of reorganization by virtue of any term or provision of this

49

Final DIP Order; (c) a preclusion or waiver to assert any other rights, remedies or defenses available to the DIP Lender, or to respond to any motion, application, proposal, or other action, all such rights, remedies, defenses and opportunities to respond being specifically reserved by the DIP Lender; or (d) a preclusion, waiver or modification of any rights or remedies that the DIP Lender has against any other person or entity.

25.      Good Faith.  The terms of the financing arrangements among the Debtor and the DIP Lender have been negotiated in good faith and at arm's-length among the Debtor and the DIP Lender and any loans, advances or other financial accommodations which are made or caused to be made to Debtors by the DIP Lender pursuant to the DIP Facility Loan Documents are deemed to have been made and provided in good faith, as the term "good faith" is used in section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event that this Final DIP Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

23.26.  Order Effective.  This ~~Interim~~Final DIP Order shall be effective as of the date of the signature by the Bankruptcy Court, and the terms and conditions of this Final DIP Order shall be (a) immediately enforceable, and (b) not be stayed absent the grant of such stay under Bankruptcy Rule 8007 after a hearing upon notice to the Debtor and the DIP Lender,

24.27.  Objection Overruled.  Any and all objection to the Motion and the entry of the ~~Interim~~Final DIP Order, to the extent not otherwise resolved or withdrawn, hereby are overruled.

25.28.  Retention of Jurisdiction.  The Bankruptcy Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this ~~Interim~~Final DIP Order.

~~26.      Notice of Final Hearing.  The Final Hearing shall be on **January 14, 2025 at 9:00 a.m. E.S.T.** in the United States Bankruptcy Court for the Eastern District of Kentucky, 100 East~~

50

Vine Street, Suite 200, Lexington, Kentucky 40507. Any objection to entry of the Final DIP Order shall be (a) filed in accordance with the Court's CM/ECF procedures or in writing with the Clerk of the Court, by 4:00 p.m. E.S.T. on the date that is seven (7) days prior to the date of the Final Hearing (as defined below) ("Objection Deadline"), and (b) served so as to be actually received by the following parties by the Objection Deadline: (i) the office of the United States Trustee; (ii) counsel to the DIP Lender; (iii) counsel to the Debtor; (iv) counsel to the Debtor's other secured lenders, and (v) counsel to any Committee then appointed in the case.

27.    Marco's Coal. For purposes of this interim order, and subject to a final order, no liens or claims, whether in favor of the DIP Lender or as adequate protection, shall attach to the 11,000 tons of coal asserted by Marco to be located on the Debtor's premises as to which Marco International Corporation ("Marco") asserts ownership and bailment rights ("Marco's Coal") or the proceeds thereof, and for the avoidance of doubt, Marco's Coal or the proceeds thereof shall not be considered Collateral under the DIP Financing and shall be excluded from any liens and claims granted under this Order. The foregoing is without prejudice to the DIP Lender, the Debtor and/or the Committee (to the extent applicable) to investigate, and challenge, the extent, validity, enforceability and priority of Marco's interests, rights and claims alleged herein, and all rights to conduct such an investigation, and assert such a challenge, by any interested party identified above are reserved and preserved; and is without prejudice to Marco and all Marco's rights and claims are reserved.

28.    Issues Reserved for Final Hearing. Notwithstanding anything to the contrary in this Interim DIP Order, for the reasons set forth on the record at the hearing held on December 19, 2024, the Court makes no findings of facts or conclusions of law with respect to any issues relating to, and in extending loans and other financial accommodations to the Debtor pursuant to this Interim DIP Order, the DIP Lender is not entitled to the benefits of: (1) the DIP Lender's request

51

~~for a lien on Avoidance Actions and commercial tort claims and the DIP Lender's request, pursuant to section 364(d)(1) of the Bankruptcy Code, for a first priority, senior priming lien on all DIP Collateral; (2) the Roll-Up; (3) the Interest Rate; (4) the Issuance Fee; (5) the Carve Out; (6) the Challenge Period; (7) the Committee Investigation Budget; (8) the Debtor's indemnification of the DIP Lender; (9) the Debtor's admissions, stipulations, and agreements set forth in Paragraph D. of the Interim DIP Order; (10) Section 7.1(p) of the DIP Facility Loan Documents regarding Claims Against Lender constituting an Event of Default; (11) Other Secured Parties' Adequate Protection Replacement Liens; (12) ACIN/Natural Resource Partners LP; (13) Marco's Coal; (14) The Liquidating Trust of INMET Mining, LLC; or (15) Blackjewel Liquidation Trust, LLC. All rights of all parties in interest with respect to the foregoing are reserved and preserved pending the Final Hearing.~~

TENDERED BY:

**DINSMORE & SHOHL LLP**

*/s/  Ellen Arvin Kennedy*
Ellen Arvin Kennedy, Esq. (KBA #88347)
Brandon E. Lira, Esq. (KBA #100654)
Dinsmore & Shohl LLP
100 West Main Street, Suite 900
Lexington, KY 40504
Tel.:      (859) 425-1000
Fax:      (859) 425-1099
E-mail:  ellen.kennedy@dinsmore.com
            brandon.lira@dinsmore.com

-and-

Matthew J. Stockl, Esq. (admitted *pro hac vice*)
Dinsmore & Shohl LLP

52

550 S. Hope Street, Suite 1765
Los Angeles, CA 90071
Tel.:      (213) 335-7737
Fax:      (213) 335-7740
E-mail:   matthew.stockl@dinsmore.com

***Proposed Counsel for Debtor and Debtor-in-Possession***

53